J-S08026-22
J-S08027-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ADOPTION OF: K.J.-L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.I.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1381 MDA 2021 |

Appeal from the Decree Entered September 28, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0136a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.B.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.I.B., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 1382 MDA 2021 |

Appeal from the Decree Entered September 28, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0138a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.J.-L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.B.B., FATHER | : | |
| | : | |
| | : | |
| | : | No. 1383 MDA 2021 |

Appeal from the Decree Entered September 28, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0136a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.B.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S08026-22
J-S08027-22

:
:
APPEAL OF: K.B.B., FATHER                          :
:
:
:
:
:       No. 1384 MDA 2021

Appeal from the Decree Entered September 28, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0138a

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED:  MAY 4, 2022**

Appellants J.I.B. (Mother) and K.B.B. (Father) collectively, (Parents) appeal[1] from the decrees granting the petitions of the York County Office of Children, Youth and Families (CYF, or the Agency) and involuntarily terminating their parental rights to their minor children, K.B.L.B. (born June 2019) and K.J.-L.B. (born June 2020) (collectively, the Children), pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).  We affirm.

On January 3, 2021, Parents brought six-month-old K.J.-L.B. to the emergency room at Hanover Hospital, stating that he had been fussy and "went limp" when Father picked him up.  **See** Order of Adjudication, 2/8/21, at 1-3.  K.J.-L.B. had one complex skull fracture along the entire length of the

_____

[1] Both Mother and Father filed separate appeals from the decrees involuntarily terminating their parental rights to the Children.  However, both Parents are represented by Ashley A. Messoline, Esq., on appeal, and their briefs present identical arguments.  Accordingly, we address Mother's and Father's appeals from the decrees terminating their parental rights to K.B.L.B and K.J.-L.B. in a single memorandum.

- 2 -

right side of his skull, and a second fracture from the top-right to top-left side of his skull. *Id.* After transfer to Hershey Medical Center, K.J.-L.B. was examined again. *Id.* The large fracture was a few weeks old, and the smaller fracture was new. *Id.* K.J.-L.B. had hemorrhaging behind both eyes and hematomas in his spine, indicative of shaken baby syndrome. *Id.*

On January 6, 2021, the orphans' court issued an order for emergency protective custody. *See* Order for Emergency Protective Custody, 1/6/21, at 1. The orphans' court issued a shelter care order on January 8, 2021 and placed the Children with a kinship resource parent.[2] *See* Shelter Care Order, 1/8/21, at 1; *See* Order of Adjudication, 2/8/21, at 1-3.

Following an adjudicatory hearing on February 8, 2021, the orphans' court declared the Children dependent and found that K.J.-L.B. was a victim of child abuse. *See* Order of Adjudication, 2/8/21, at 3. The Order suspended visits between Parents and the Children. *Id.*

On February 10, 2021, a CYF caseworker completed a home visit with the family. *See* Status Review Order, 4/7/21, at 2. Mother showed the caseworker child's toys, explaining that K.B.L.B. could have dropped the toys on K.J.-L.B. to cause the injuries. *See* Status Review Order, 4/7/21, at 2. Visitation remained suspended. *Id.*

_____

[2] Maternal Grandparents separately initiated a custody action, in which they were granted standing, and sought leave to intervene in the instant dependency matter. *See* Response to Pet. to Intervene, 5/10/21, at 1-3. At the time the Children were placed, they had not been approved as potential kinship foster parents. *Id.*

On February 21, 2021, Mother and Father were arrested and charged with aggravated assault – attempt to cause serious bodily injury with extreme indifference; endangering the welfare of a child; aggravated assault – victim less than six-years old; and simple assault.[3]

On April 7, 2021, the orphans' court held a status review hearing and entered an order noting that Mother had admitted that the Parents shook K.J.-L.B. and demonstrated the movement "rapidly and aggressively," but the Parents claimed they did not think they shook the baby hard enough to cause shaken baby syndrome. *See* Status Review Order, 4/7/21, at 1-2. The orphans' court made findings that K.J.-L.B.'s treatment team at Hershey Medical Center determined that his injuries were the result of non-accidental blunt force trauma to the skull and were consistent with "a violent amount of force to [the Child's] skull by striking it against a hard object and then shaking his body in the process." *Id.* K.J.-L.B. was in the sole care of Mother and Father at the time the injuries occurred. *Id.* The injuries were not consistent with accidental trauma and neither Parent could provide an explanation for the injuries consistent with the medical findings. *Id.* Visitation remained suspended. *Id.*

At the conclusion of the hearing, the orphans' court entered a finding of aggravated circumstances against the Parents, because K.J.-L.B. was the

---

[3] 18 Pa.C.S. §§ 2702(a)(1), 4304(a)(1), 2702(a)(8), and 2701(a)(1), respectively.

victim of physical abuse resulting in serious bodily injury. *See* Agg. Circumstances Order, 4/7/21, at 1-2; N.T. Term. Hr'g, 9/28/21, at 8. The Order provided that no efforts were to be made to preserve the family and reunify the Children with their Parents. *Id.*

On May 5, 2021, the orphans' court held a permanency review hearing, and found that the Parents had been in minimal compliance with the permanency plan. *See* Permanency Review Order, 5/4/21, at 1. On June 5, 2021, following a permanency review hearing, the orphans' court changed the Children's permanency goal to adoption. N.T. Term. Hr'g at 9. On June 14, 2021, Maternal Grandparents filed petitions for adoption and petitions to confirm consent to adoption of the Children. *See* Pet. for Adoption, 6/14/21, at 1-3. On July 7, 2021, CYF filed petitions seeking to involuntarily terminate the parental rights of Mother and Father.

On September 28, 2021, the orphans' court held a termination hearing.[4] Mother and Father did not attend the hearing because Mother had severe abdominal pain and was taken to a local hospital. N.T. Term. Hr'g at 5. Mother was not admitted to the hospital; rather, she was given a note that she could return to work and follow up with her primary care physician. *Id.* at 10. The

---

[4] Gillian Woodward, Esq., represented the Children during the dependency proceedings as guardian *ad litem* and appeared at the termination hearing to argue the Children's best interests. N.T. Term. Hr'g at 4. Daniel Worley, Esq., served as Children's legal counsel during the termination proceedings, and appeared at the hearing on their behalf. *Id.*; *see also*, *e.g.*, *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020).

court stated on the record that there was no reason Mother could not attend the hearing in person or remotely. *Id.*

Attorney Janine Vinci, representing both Parents at the hearing, filed a motion for special relief the day before the hearing, requesting a continuance so that she could present witnesses. *Id.* at 3-4. She argued that K.J.-L.B. had a vitamin B deficiency which could have caused a bone density issue, resulting in the severe injuries. *Id.* at 4. CYF responded that neither Parent had requested a continuance prior to the hearing or appealed the adjudication of dependency or goal change. *Id.* at 9. Accordingly, the circumstances leading to the placement of the Children, including the finding of child abuse, were *res judicata*. *Id.* at 9. The orphans' court denied the Parents' motion for a continuance. *Id.* at 14. The orphans' court incorporated the dependency records into the termination hearing record, and CYF presented the testimony of Alexis Torres, a CYF caseworker. *Id.*

Ms. Torres testified that she is a reunification and permanency caseworker for CYF. *Id.* at 17. As the assigned caseworker for the Children, she worked with the family for eight months. *Id.* at 19. As of the date of the termination hearing, Mother's and Father's criminal cases related to the abuse of K.J.-L.B. remained unresolved. *Id.* at 19-20.

Both Mother and Father signed a family service plan. *Id.* Parents' original goals were to ensure that the Children's basic needs were being met, which included cooperating with Early Intervention and attending medical

appointments, as well as cooperating with various treatment programs and evaluations. *Id.* at 32. Initially the reunification goal was "return to parent or guardian," but as noted above, following the aggravated circumstances determination, the goal was changed to adoption. *Id.* at 31.

Beyond completing adult alternatives to violence evaluations, neither Parent completed any objectives or goals in the plan. *Id.* at 19-20. Further, neither Parent provided a required "formal addendum" of the evaluation. *Id.* at 39-41. In addition, neither Parent followed through with any recommendations provided in those evaluations. *Id.* at 34. Nor did either Parent complete a "threat of harm" evaluation. *Id.* at 36-42. One of Mother's goals was to take her medication as prescribed by medical professionals, but she indicated to a caseworker that she had stopped taking her medication. *Id.* at 36. Mother did not complete a required psychiatric evaluation. *Id.* at 36-37. Neither Parent complied with the goal to complete individual mental health counseling. *Id.* at 38-41. Nor did either Parent provide documentation of parenting classes focusing on discipline, coping skills, and stress management prior to the termination hearing.[5] *Id.*

Both Parents were living with the woman who had been Mother's foster mother when Mother was a minor but did not provide any documentation of

---

[5] Although there was some discussion that both Parents had attended parenting classes and informed Ms. Torres of this fact on the morning of the termination hearing, they did not provide written documentation showing that they had completed the parenting classes. N.T. Term. Hr'g at 38-39.

their own residence, contribution to household expenses, or lawful source of income. *Id.* at 20-22. Neither Parent provided any cards, gifts, or presents to the Children while the Children were in kinship placement. *Id.* at 27. Nor did either Parent request increased visitation with the Children, such that the last visit for both Parents occurred around January or February of 2021. *Id.* at 22-23. Both Parents did contact CYF about the Children's progress with dental, medical, or therapeutic services at the beginning of the case, but as of the date of the involuntary termination hearing, Ms. Torres had not been contacted by either Parent for "about five months." *Id.* at 27-28. Ms. Torres testified that Mother and Father did not have the parental capacity to care for the Children. *Id.* at 30.

Ms. Torres testified that the Children were not bonded with Mother or Father. *Id.* at 24. She testified that there were attempted supervised Zoom visitations, but the result was chaotic. *Id.* at 33. K.B.L.B. wanted "nothing to do with the phone" but would scream and cry if Parents gave attention to K.J.-L.B. *Id.* at 33.[6] Parents were not able to calm the Children. *Id.* Ms. Torres could not specify how many visits occurred. *Id.* at 35.

The Children are developmentally on target, and K.J.-L.B. is receiving physical therapy services due to concerns regarding his mobility. *Id.* at 29. Neither of the Children have requested to visit Parents. *Id.* at 43. Both

_____

[6] During the COVID-19 pandemic, all supervised visits occurred via Zoom. *Id.* at 35.

Children have an excellent bond with the resource family and are very close with them. *Id.* at 25. The Children view the kinship resource family as parental figures. *Id.* A pre-adoptive resource has been identified for the Children.[7] *Id.* at 27. In Ms. Torres' opinion, the Children would not suffer long-term negative impacts if the orphans' court granted the petitions to terminate the Parents' parental rights. *Id.* at 30.

Attorney Worley, as legal counsel for the Children, stated that he had had the opportunity to meet with them at the kinship home and they seemed very bonded to the kinship resource. *Id.* at 45-46. He testified that the Children needed permanency, and that the petitions should be granted. *Id.* at 45-46. Attorney Woodward, as guardian *ad litem* for the Children, also stated that it was in the Children's best interests for the petition to be granted. *Id.* at 46. At the conclusion of the hearing, the orphans' court terminated the parental rights of both Parents pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).

Both Parents timely appealed and simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The orphans' court issued a responsive opinion.

On appeal, Parents raise the following issue for our review:

---

[7] It is unclear from the record whether the pre-adoptive resource was the kinship resource family or the Maternal Grandparents, who filed a petition for consent to adoption. *See*, *e.g.*, Pet. for Adoption, 6/14/21, at 1-3.

> 1. Whether the court erred in finding that Children and Youth Services proved the elements of 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b) through clear and convincing evidence?

Mother's Brief at 5; Father's Brief at 5 (formatting altered).

We begin by stating our standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights*. In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a)(2) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of

> the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

> To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

> Further, this Court has explained:
>
> The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct.
>
> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.
>
> Thus, while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

- 12 -

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (citations omitted and formatting altered).

Further, this Court has stressed that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *Interest of D.R.-W.*, 227 A.3d 905, 914 (Pa. Super. 2020) (citation omitted and formatting altered).

### Section 2511(a)(2)

Parents argue that CYF did not prove by clear and convincing evidence that the statutory grounds under Section 2511(a)(2) were met. Mother's Brief at 16; Father's Brief at 16. The Parents contend, specifically, that the evidence was insufficient to prove that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied, because there is nothing in the record to support that conclusion. *Id.* Parents argue that the court relied on outdated information from nearly five months prior to the hearing and used the wrong standard of proof because it found that Parents were "unlikely" to remedy their incapacity. *Id.* at 16-17. Finally, Parents argue that due to the finding of aggravated circumstances and lack of services provided, it was "absurd" to expect that they could remedy the incapacity. *Id.* at 18.

Prior to examining the merits of Parents' claim, we must determine whether they have preserved their claims for purposes of appeal. While Parents cite generally to the statute, they make no meaningful citation to, nor discussion of case law in support of their arguments regarding Subsection

2511(a)(2). This Court has held that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (citations omitted); *see also* Pa.R.A.P. 2119(a) (providing that the argument section of appellate brief shall contain discussion of issues raised therein and citation to pertinent legal authorities). Because the Parents have failed to provide any support or relevant authority supporting their claim of error, we conclude that this claim is waived. Therefore, on this record, no relief is due.

However, even if we did not find waiver, the Parents would not be entitled to relief on the merits. The orphans' court discussed its findings under this subsection as follows:

> [I]t is clear from the record that CYF offered clear and convincing evidence that the incapacity, abuse, neglect, or refusal by the parents have caused the children to be without essential parental care necessary for their mental well-being and the conditions and causes of the incapacity, abuse, neglect, and refusal will not be remedied by the parent. As stated above, K.J.-L.B. suffered abuse consistent with shaken baby syndrome. The baby suffered from neglect and abuse while in Mother and Father's care, experiencing trauma from physical abuse. Six-month-old K.J.-L.B. presented to the emergency room with two skull fractures, one newer and one older, a subdural hematoma, retinal hemorrhaging, and bleeding around his spine. As a result of this "non-accidental, blunt force trauma," the child may suffer from long-term impairment of cognitive, neurological, and ocular functioning. Mother and Father's explanation of how K.J.-L.B. sustained such injuries was not consistent with the medical findings. Parents asserted that minor child, two-year old K.B.L.B., may be the cause of both of the baby's skull fractures and other injuries. A month

into the investigation, Mother and Father admitted that they both shake K.J.-L.B. to quiet him.

> On February 10, 2021, [CYF] caseworker completed a home visit to the mother and father's home to review the family service plan with the two. During the visit, mother showed the caseworker various toys that she thought [K.B.L.B.] could have dropped on [K.J.-L.B.'s] head to cause the injuries. Mother stated during the home visit that both she and father would shake [K.J.-L.B.] to calm him down; she demonstrated the shaking movement and moved her body left and right rapidly and aggressively. She also indicated that they shook in the car seat in the car to calm him down too. She said this is the only thing that could have caused his brain to bounce around from shaking, but then said she didn't think that was what caused the injuries. As present during this discussion and indicated that he had Googled how hard one must shake a child to cause these types of injuries and that it would have had to have been 40 miles per hour and he did not believe they shook him that hard.

[*See* Status Review Order, 4/7/21, at 1-2.]

Mother and Father blame two-year-old [K.B.L.B.] for [K.J.-L.B.'s] newest fracture. Mother even made a video of [K.B.L.B.] saying, "I boomed baby, I'm sorry." Also Mother and Father blame K.B.L.B. for K.J.-L.B.'s older fracture as well. No objection was raised for the admission of these exhibits on the record during the Permanency Review hearing on May 5, 2021. An Aggravated Circumstances Order was entered on April 7, 2021. Given this, no efforts were made to reunify the children with Mother and Father. Since Mother and Father continue to blame two-year-old K.B.L.B. for his brother's shaken baby syndrome, it is unlikely that the condition and causes of the abuse will be remedied by Mother and Father. CYF has provided sufficient evidence . . . that the Mother and Father's incapacity, abuse, neglect, or refusal has caused the child to be without essential parental care necessary for [their] well-being and the conditions and causes of the abuse, neglect, and refusal will not be remedied by Mother or Father.

Orphans' Ct. Op. at 6-8 (some citations omitted and formatting altered).

Were we to reach the merits of this issue, we would find no abuse of discretion or error of law in the orphans' court's conclusion that the Agency presented clear and convincing evidence to support termination of Parents' parental rights under Section 2511(a)(2). ***See T.S.M.***, 71 A.3d at 267; ***see also R.N.J.***, 985 A.2d at 276. The record reveals that Ms. Torres testified that an initial family service plan was provided to Parents, and that Parents did not complete the majority of their goals. ***See*** N.T. Term. Hr'g at 35-41. The sole goal completed was attendance at an anger management evaluation, but Parents failed to complete the required formal addendum. ***See id.*** While the aggravated circumstances order meant that CYF was not required to provide services, Parents could have arranged for services on their own but did not. ***See id.*** As a result of their failure to follow through with these recommendations, Ms. Torres testified that neither Parent had the capacity to care for the Children. ***See id.*** at 30.

Additionally, we agree with the orphans' court that Parents' continuing unwillingness to accept responsibility for K.J-.L.B.'s injuries is troubling and indicates a continuing incapacity that they are unwilling to remedy. ***See***, ***e.g.***, Orphans' Ct. Op. at 6-8. Rather than acknowledging the harm caused to K.J.-L.B., who was in their sole care, Parents continually minimized the harm to him or blamed K.B.L.B. for the injuries, despite a finding of abuse and aggravated circumstances that they did not appeal. Neither Parent appeared at the termination hearing nor attempted to attend the hearing via Zoom.

These considerations in combination with Parents' refusal to complete parenting classes or other programs to help alleviate safety concerns for the Children if they were returned to the care of Parents, is sufficient to prove by clear and convincing evidence such an incapacity and Parents' unwillingness to remedy it. *See Z.P.*, 994 A.2d at 1117-18.

For these reasons, were we to reach the merits, we would conclude that the orphans' court properly found that the termination of Parents' parental rights best served the needs and welfare of the Children pursuant to Section 2511(a)(2).

## Section 2511(b)

We next review the orphans' court's conclusion that involuntarily terminating Mother's and Father's parental rights best serves the Children's developmental, emotional, and physical needs and welfare pursuant to Section 2511(b), which states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (citation omitted). We have explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations and quotation marks omitted). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268.

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). The question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *Id.*

at 764. "Section 2511(b) does not require a formal bonding evaluation" and caseworkers may offer their opinions and evaluations of the bond. **Z.P.**, 994 A.2d at 1121 (citations omitted).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, . . . the result, all too often, is catastrophically maladjusted children." **Id.** Finally, we reiterate that the court may emphasize the safety needs of the child. **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011).

Parents argue that CYF did not prove by clear and convincing evidence that termination is in the best interest of the Children. Mother's Brief at 24; Father's Brief at 24. Specifically, they contend that the caseworker was not able to witness the parent-child relationship in person, and thus, based on the testimony and evidence presented, it is impossible to conclude that severing the parent-child bond would be in the best interest of the Children. **Id.**

> The orphans' court observed:

> In regard to 23 Pa.C.S. § 2511(b), it is clear from the record that CYF offered clear and convincing evidence for the [c]ourt's consideration that the developmental, physical, and emotional needs and welfare of the children are best served by terminating parental rights. The [C]hildren in this case have no bond with the biological parents.

> K.J.-L.B. is now about a year old and has not seen Mother or Father for the past eight months. K.B.L.B. has also had no contact in the past eight months. The [C]hildren's caseworker testified

that the [C]hildren "have an excellent bond with the resource family." The [C]hildren view the resource parents as their parental figures. K.B.L.B. is developmentally on target. He was evaluated through Early Intervention and is not in need of services. K.J.-L.B. has special needs and is receiving physical therapy through Early Intervention for concerns regarding his mobility. His other medical needs have been addressed. CYF has provided sufficient evidence under 23 [Pa.C.S.] § 2511(b) that the termination of parental rights best serves the interest of [the Children].

Orphans' Ct. Op. at 13-14 (citations to the record omitted).

On this record we agree with the orphans' court's finding that the Children have no bond with the Parents. During visitation with the Parents, both Children appeared upset and "chaotic," and throughout the pendency of the case neither of the Children has inquired about or mentioned either Parent. **See** N.T. Term. Hr'g at 33-35. Ms. Torres testified: 1) neither of the Children has a bond with either Parent; 2) both Children are bonded with their foster parents; and 3) severance of the bond would not cause long-term harm to the Children. **See id.** at 24-25, 30. Thus, it was reasonable for the orphans' court to conclude within its discretion that no bond exists. **See K.Z.S.**, 946 A.2d at 762-63; **see also Z.P.**, 994 A.2d at 1121.

Finally, we note that the record reflects that neither Parent has accepted responsibility for K.J.-L.B.'s injuries, and that both have continually minimized or blamed K.B.L.B. for the injuries. **See**, **e.g.**, Status Review Order, 4/7/21, at 2. Neither Parent has completed any required program or treatment for mental health issues, stress management, or parenting, and accordingly, the safety of the Children cannot be assured. On this record, severance of the

bond is in the best interests of the Children due to these safety concerns. *See*

*C.D.R.*, 111 A.3d at 1219.

For these reasons we conclude that the record supports the orphans' court's conclusions that there was no bond between the Children and the Parents, and that the resource family is fulfilling parental roles for the Children. Likewise, the record supports the orphans' court's determination that the termination of Mother's and Father's parental rights served the best interests of the Children. *See C.L.G.*, 956 A.2d at 1009-10.

In sum, we conclude that the orphans' court did not abuse its discretion in terminating Mother's and Father's parental rights to the Children. *See id.* Accordingly, we affirm.

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/04/2022